Good morning. Our first case today is 2011-1542, IN RE FINJAN. Mr. Andre. May it please the court, Paul Andre for FINJAN, Inc., the appellant. In this case, the board made several legal and factual errors in affirming the examiner's rejection of the claims of FINJAN's patents. The errors related mostly to the technology aspect as well as procedural aspects. With respect to the technology aspects, the board only looked at two elements of one claim, of the four elements possible, and ignored the other seven independent claims altogether. The first error on the technology aspect was regarding the first claim of operating system, monitoring operating system for a request made by a downloadable. The problem the board had is not understanding what an operating system is. An operating system is made up of several subsystems, the file system being one of those subsystems. The prior art was designed to monitor only the file subsystem, which is not something that you would find unexpected. In 1993, when this prior art was published, that's how viruses attacked a system. The fact of the matter is, viruses used to attach to a file, be introduced into a computer through a file, and attack the file system. Therefore, the prior art only addressed that. The 520 patent talked about monitoring the entire operating system. This would be akin to saying you have an alarm system for a house, so you say it would monitor a house, but it would only monitor a room. The prior art would only monitor a room. It would not monitor the entire house, and that is the case that we have here. Now, something happened in 1995 that changed the landscape dramatically. One was the introduction, or the launch of the commercial internet. That was in May of 1995, and the second one is the introduction of mobile code in the form of Java, a computer language. That was introduced in 1995 as well by some microsystems. That paradigm shift in how computing was done made the 520 patent necessary. The second technical aspect that was misapprehended by the board was the comparing information pertaining to a downloadable against a security policy. That's the third claim element. The prior art had no concept of what a downloadable was. It didn't even look at the downloadable. What the prior art did, the Biorec system was it built a fort around a file, and basically anything that would go in and try to touch that file, friend or foe, would trigger a response. It would shut it down. It wouldn't allow it to touch the file. It was there to protect the files. It didn't care what the downloadable was. That concept was not disclosed in the prior art because, once again, the system of the 520 patent talks about looking at the downloadable, getting information from that potential downloadable, and comparing that information to a security policy. Once again, a concept that was not even contemplated in 1993, and clearly not by the reference relied on by the examiner. Now, in order to try to sustain the rejection, the examiner and both the board conflated the first claim element, which is looking at the request made by the downloadable, to information pertaining to the downloadable, the third claim element. That over-broad reading... Is it true, though, that the board addressed the claims precisely as you addressed them? You kept talking about the board having collapsed its analysis of the claims, but it responded to the way that you presented them, did it not? I respectfully disagree. The board gave a very superficial review of two claim elements. What Finjen did was we recited six different claim elements of the eight independent claims that we believe were not in the prior art, and then we went through approximately a 30-page analysis talking about how those elements were not met by the prior art. What the board did was just look at two very, I would say, superficial reviews of two of those claim elements in claims 1, 2, 7, and 8. It did not consider the claim elements in 3 and 4, the comparator, and I believe it was the operating system interface, nor did it look at the meansless function claims of 5 and 6. So, in that respect, Finjen did a very comprehensive analysis of all the different claim elements. The board didn't do that. The board did focus on the concepts that Finjen emphasized, the concept being monitoring the operating system and then comparing information pertaining to downloadable. It's just on the technical sense, they just completely misapprehended what was going on in the prior art and what was happening in with respect to the Finjen patent as well. You seem to be focusing on the absence of discussion of some of the elements in the claim. Originally, obviously, you argued the same arguments that the court addressed in ANTOR, whether or not the reference that is prior art is enabling, and you said there is a presumption, and you, not you personally, but that idea has been entirely shut down. Do you now accept entirely that androgynous, I don't even know how to say it, androgynonous, do you now agree that it is enabled, or are you still going to continue to dispute, do you, for example, argue that we overcame, even if there is a presumption that we overcame it? I just want to know exactly what your position is now, following ANTOR, on the issue of the enablement of the prior art reference. We're arguing that we overcome the presumption. I mean, obviously, we did argue that there should be no presumption, and that has been laid to rest, as we can see here today, but we do believe we did overcome the presumption of enablement. And the fact of the matter is, is, you know, the... With your expert affidavit, is that what you believe overcomes it? That and the argument we provided. What, you know, the enablement is based on an underlying factual finding, and there are three facts in this particular case that was determined below that should have been addressed. And the first one was that all parties agreed that the reference was a handbook that taught people how to install and use a program, and that was this. The examiner concluded that, as did we. And the other factual finding was that the examiner relied on the disk, the software that was actually provided with the handbook, even though it was not part of the record. He said that, essentially, because the disk worked, the reference must be enabled. We think that error is a matter of law. And then the third thing was our expert declaration. Those are the three factual issues that were presented below. And the fact that the board did not consider those issues, and all the new experimentation would be required. Part of my problem is that your entire argument to the board on enablement was one paragraph. Now I admit you didn't know about the Antwerp presumption, but how can we say that you properly raised all these issues to the board, or that you satisfied any burden you might have when you addressed it in one paragraph? Well, we addressed it in, I believe it was multiple paragraphs in the actual brief sublet with the expert declaration, which addressed 11 different factual points, in which the expert stated, there are just certain elements that are not present, period. It's not whether you require undue experimentation or not. These elements are just not in the reference. They were not contemplated because, once again, we're talking about apples and oranges. So in that respect, the fact that the board didn't consider the expert affidavit is even more error. I'm sorry, were you done? You refer to the comparing information pertaining to the downloadable step. Why is it not the case that, I guess it's VPC scan, which identifies known viruses in the downloadable and then addresses them in whatever method it does if it identifies the viruses. Why isn't that a comparison of the downloadable against a predetermined security policy, which is to prohibit those viruses from being run? This is actually one of the errors we believe that the examiner committed. The VPC scan is actually a, it's not a monitoring system at all. It is a on-demand scanning system. And what the examiner did, it's a separate program altogether from virus. They cannot run together. They run separately. They're actually two separate programs. So if you do the VPC scan initially and to determine what viruses are there, it shuts down. It doesn't monitor anymore. You have to go back and call it again. So it doesn't monitor files at all. And what the examiner did was trying to bootstrap in that exact argument, put in the VPC scan into it with the virus program. And that's improper. And we stated that both below with our expert declaration and in argument to show that you cannot combine those two programs in any way whatsoever. So that's the reason that element is completely missing. They try to cover that by using the VPC scan exactly. With respect to the expert affidavit, we also believe that the board erred in not considering the expert affidavit. The Ashland Oil case and NRA Alton case made it very clear that you should at least give some consideration to expert affidavits. They didn't mention it expressly, but the examiner certainly addressed it extensively. And they adopted the examiner's findings. So, you know, I mean, to say they didn't consider it, if really, if there was a line in the opinion that says we don't consider it, but you know, what we've held in many occasions, failure to actually explain your rationale for rejecting something isn't the same thing as failing to consider it. Yeah, I appreciate that distinction. In this particular instance, I believe what we brought to the board's attention was the importance of the examiner, the expert declaration. And the fact that we highlighted that importance of it and how that distinguished the art, the patent over the art, and the fact that it was not mentioned at all, I think separates that from the other cases. Rather than just say we adopt or we expressly agree with the examiner's decision, you would have been more comfortable if the board had said we agree with the examiner's decision related to the affidavit. At least it would have shown that there was some consideration given. I think our biggest complaint is at the end of the day, the examiner put in an 84-page answering brief. I know. And I think... It's kind of tough to read. Yeah, it's impossible. It was a confluence of... Languages. ...contradictions and languages. It was very difficult. And I think the board just threw their hands up and gave a very superficial review and gave a very superficial analysis and affirmation. You're into your rebuttal time. Do you want to say something? Yeah, I would like to. Thank you. Mr. Kelly. Good morning. May I please report? The board approached Fingen's case exactly as Fingen directed it to. Fingen did not present to the board a detailed analysis of its declaration. It presented arguments about essentially two claim limitations. And then in doing so, it referenced its declaration a handful of times and then only to two or three paragraphs. Paragraphs that the examiner had said in the very complete examiner's answer, paragraphs that were identical to the arguments Fingen was already making. The two claim limitations Fingen argued to the board had to do with the monitoring limitation and information pertaining to the downloadable. At no point did Fingen pull out different claims and say, well, even though the monitoring is in these two claims, you need to approach it differently because in claim one, it's this way. And for example, in claim three... Part of the problem with the board's brief is that it is entirely process-oriented. Rather than address the arguments head-on or address the weakness of the expert's affidavit, you simply continue to argue, well, they didn't really explain that this was their concern as well as they could have, and so we didn't have to address it. But yet, you nowhere give us anything that would give us some comfort that in fact, had the board addressed the expert affidavit, it would have reached the same conclusion. Well, Your Honor, I don't think it's necessary for the board to go around the arguments presented to it and dig for perhaps better arguments or for perhaps better evidence. Fingen presented its arguments to the board in terms of process. I believe Fingen says in its reply brief that at page A700 of its brief to the board, it went through and talked about the comparator limitation. And in fact, in that part of Fingen's gray brief, it actually says, we talked about the comparator limitation, it says comparator three times. But if you go to the brief that it presented to the board, you won't see the word comparator. All Fingen did is talk about the comparison. Fingen presented a very high-level dispute to the board about two process limitations. And these are very broad claims. We have the monitoring, and the prior art expressly says it monitors. And we have the information pertaining to a downloadable, and the prior art expressly says, when we find in Virex, not in the scan software, but in the monitoring software, when we find a signature of a virus, we block the operation of the program. That's precisely what their software does in their patent. Well, but what about the distinction between blocking files, infected files versus blocking the infected operating system on which they rely? Your Honor, I don't really think that's much of a distinction. First, I think I can admit that perhaps the two systems operate differently. That is, the system Fingen discloses and the system described by the prior art. I guess what their declarant is saying is that we have this complete and utter control of the operating system. And what the prior art does is different, that it only intercepts selected requests from the operating system to various other programs. The problem with that, Your Honor, is that the claim doesn't recite any sort of language that would require an absolute control of the operating system. The claim says that the operating system is monitored for certain things. And indeed, in the prior art, there is monitoring for those certain things, for requests to certain programs. They don't claim it in terms of the absolute control of the monitoring system. So the fact that their declarant has observed that there's some amount of operating system that perhaps isn't being controlled, that doesn't get around the prior art. And that's how the board approached that argument. And what's the effect of this presumption that arises? I mean, if the prior art, on its face, is not enabling, even if it is an article that references the general technical area, wouldn't that be enough for them to just say, look at the prior art itself and you can see that it's not enabling? Well, I guess I wouldn't agree at the threshold that the prior art is not enabling on its face. Their argument is that this prior art is a description of something else, and the rejection is not based on the something else. But that's always the case, right? I mean, if the claim is to a chair, we're going to reject it over a description of a chair. We're not going to reject it over a chair itself. So there's always going to be an abstraction between the actual program and the prior art used. So I think that Judge O'Malley's question is important. I mean, you agree that presumption is rebuttable. Absolutely. So then the question is, can they rebut it by simply pointing to the reference and saying, look, there is a complete and utter absence of disclosure of any means for accomplishing this in the reference? Read the reference. Or is this going to be a universe in which the only way they can ever overcome the presumption that the PTO is to introduce extrinsic evidence in the form of an expert or something else? I mean, that would seem to create a large burden for patentees to have to contend with in the future, to always have to introduce expert testimony. It seems like argument and the reference itself ought to, in some cases, be enough. Are you saying you reject the idea that it's ever enough to overcome the presumption? No. I think what ANTOR says is that they need to make some sort of showing. And in another place, NANTOR might actually refer to evidence that's needed. But I don't know that there's a requirement that the evidence come from a new expert that they go out and have to hire. They don't have to begin manufacturing evidence at that point. There might be evidence already in the record. And in some cases, I suppose the reference itself could be evidence. The problem in this case is that this reference is just as detailed as Fingen's patent. But that doesn't have anything to do with the, what we're talking about is the validity of the enabling aspect of the reference. I mean, that's sort of a circular, because if the patent itself is not enabled for some other reason, that's a different inquiry, right? That's fair, Your Honor. But the point I was trying to make is that the description of software, which I think it's fair to say that this is directed to software, the description of software is not always, although perhaps it should, is not always going to have code in it. It's not always going to have a detailed algorithm, unfortunately, of how the software operates. It's going to have a description of the method the software performs. And then the question's going to be, does somebody skilled in the art, does a computer programmer, when given something like the prior art's description here of what they want the method to do, are they going to be able to write code to force a computer to do that method without undue experimentation? Now, it's pretty... Well, in this application, there clearly is what we have referred to as an algorithm in the past. There's lots of detailed stuff. In the prior art, which I think you could describe as one of those software installations for dummies, right? I mean, that's how they describe it themselves. They said, don't worry, this won't hurt your head. There's not a lot of technical stuff in here. I mean, the prior art itself contains nothing that at least mimics the kind of algorithm that we've looked at in the past and found enabling in the past. Well, I think what we've got to compare is the prior art's description of the four steps that are claimed in the claimed method. You might be on something, Your Honor, that their method described in their patent perhaps has some more detail in it that is missing from the prior art. But of course, the inquiry has to begin with what they've claimed. They've claimed a very straightforward four-step method, and they've claimed it in various forms. And the prior art discloses those steps. And the fact that the prior art might not tell someone exactly how to write code to do those four steps, given the breadth of the claim, and frankly, you're right, it is the sort of book we would see written to maybe the lay audience, although frankly, having read it, I think the lay audience reading this book might have been more sophisticated than the lay audience now. I think that there's enough there, and certainly it's not difficult for somebody to make some sort of showing that, hey, nobody would know how to write a program to do this, and they haven't done that. Well, that's a question of fact, too, isn't it? Is it a question of fact? You know, I think it's a question of fact, but I'm not certain. I'd be happy to... Could you address the question of the comparing information pertaining to the downloadable The examiner relied in his brief on the VPC scan as satisfying that in the prior art. Mr. Andre, that really is an inappropriate reference. Two things about that, Your Honor. First of all, I don't think that we would agree at the outset that the prior art teaches two distinct programs. In fact, the way the prior art describes it on page JA-743, it refers to Virex, which is the monitoring part of the software, as, quote, the second part of the program. So, yes, they have a two-part program, one scans, one monitors, but I don't think it's even correct, even if you give them that only the Virex monitors, that the Virex doesn't look at things pertaining to a download, because at A-756, the reference specifically says, Virex gives you two alerts, one when a checksum has been modified, and one when a known virus is detected. And the reference also refers to the virus signatures. And it also refers to the need to update Virex periodically so that new information about viruses can be put into the system. I think then it's fair to say that the only way this really could work is if these virus signatures that have to be updated and that are looked for in the scanning part, the Virex part, that it's got to be looking for those signatures in the information pertaining to the download. And that would in turn constitute comparing the downloadable against a known security policy or against a predetermined security policy. Yes, at least that would. Right. Judge Moore, I want to come back to your question, because I'm still thinking about it. What a reference teaches is a question of fact. I know, but enablement is a question of law. So whether a reference is enabling kind of is a, that's a legal question. But I think in this case, the question is whether, so we have, now we know from ANTOR we have sort of a two-step process here. We have the presumption and we have the rebutting of the presumption, and then if they've rebutted it, we're going to weigh it and then review that question. Our position here is they never actually rebutted the presumption. Now they cited to their declaration, and I think he said 11 paragraphs in their declaration. Well, the declaration wasn't cited once in their discussion of enablement. It was only cited a handful of times in their entire briefing to the board, and only two or three paragraphs were cited. So the argument that we were supposed to dig into the declaration in order to ourselves shift the burden back against us just doesn't make sense. What about the, I mean, what about the fact that you've got a combined circumstance here where there was no knowledge that they were working against the presumption at the time, and you do have that examiner's brief that is, as Judge Moore said, difficult to read, and I think that was being timed. In those circumstances, wouldn't it make some sense to send it back to the board to say, why don't we really look at these issues in light of what the current state of the law is? In our view, Your Honor, the current state of the law hasn't changed because of ANTOR. ANTOR confirmed the USPTO's understanding of the law that had been in the NPEP for some time. In ANTOR media itself, they had made this argument, and ANTOR didn't vacate and remand so that this rebuttable presumption could be analyzed. And in fact, in ANTOR, they had declaration evidence. It was just like this case. It was actually probably a little bit more favorable to the appellant in ANTOR because they argued their declaration evidence against the presumption of enablement. Here, although they say they've done that, they've just cited their declaration, but in any event, our position has always been the same. We're not shifting. Our NPEP has said, this is the way it works. We cannot investigate enablement on our own. You have the burden of showing it to us. Nothing has changed there, and so I don't think it calls for remand on that issue at all. I take it that you alluded to this, and you have a reference in your brief, but I take it that you're relying significantly on the proposition with respect to enablement, that the degree of enablement depends on the specificity of the claim, so that if the claim is at a fairly high level of abstraction, as this claim seems to be, then a fairly high level of abstraction without significant supporting detail would be sufficient to enable the prior art. That is to say, to have prior art that basically discloses an abstraction, if that's all that's disclosed by the claim. I take it that that's the thrust of part of your argument, if I characterize it over broadly. From the look on your face, I suspect that you don't entirely subscribe to my characterization. I do, Your Honor. I'm just thinking of one sort of step further than what you just suggested. Go ahead. I agree with what you've said, but there's another part of it too, which is that what we would see from the prior art would be in fact less than we would need from the patent, because the prior art, you're right, only has to enable this very high level claim, and the prior art only has to enable one specific instance of this very high level claim. So whereas the patent would have to have a much more fulsome enablement, because it would have to enable the full scope of the claim, which the prior art doesn't. That's the only thing that I want to add. Unless the Court has any more questions, we will give you back your 45 minutes. Thank you. Thank you, Mr. Kelly. Your Honor, you have three and a half minutes of rebuttal time. I just want to address a couple of issues that Mr. Kelly had talked about. He talked about the operating system. He agrees that they don't monitor the entire operating system, but there's something that says our claims don't require that. Our claims do require that. We talk about monitoring the operating system. That's what the claims talk about. The prior art talks about monitoring a file subsystem. It's not the operating system. So that in and of itself, and the admission made here in this oral argument, is enough to overcome the prior art. The second issue regarding, Judge Breslin is talking about comparing information pertaining to the downloader. One thing that the examiner and the Board has done consistently is confuse that with the information, the system for monitoring, operating system for a request made by the downloadable. The request made by the downloadable will actually go to the file system itself and make a request. That's the first claim element. You monitor that request. That's not information about the downloadable. Nothing in this reference ever talks about information pertaining to the downloadable. The word pertaining means something. It means it's going to look at the actual code coming into the system, the virus or the malware, whatever it is, and try to characterize what that is. I thought that the prior art disclosed identification of a prior previously identified virus, which would be looking at the virus, presumably the code, and determining, aha, there's a prior malicious agent. The scan system does. The VPC scan. But you say that's not what a virus does. That's not what a virus does. The VPC scan is a traditional signature-based virus detection. It's been around since the 80s. It goes in. It looks at known viruses. It looks at byte code and says, is this a virus we know about? What this patent is trying to do is because the world changed in 1995 with the introduction of the Internet and the Java computer language, it looks at the actual code coming in and says, what are you trying to do? What kind of code are you? That's a big difference. And that was the sea change that this patent is talking about. So looking at the information pertaining to the downloadable as compared to looking at what's actually being requested at the file system are two different things and two different claim elements. And over and over again, the examiner and the board conflated those two. And that's just inappropriate. With respect to enablement, these are not simple method claims. There's also means plus functions were identified, specific means were identified. There are also system claims as well, the comparator limitation being one example. Those are argued in the briefs as well. So as far as enablement goes, this is not a simple, this is a method we can just code to. The fact of the matter is, if this reference is enabling, then every user manual in the world is enabling. And that's just not the case. I mean, companies would not give blueprints for their software. It just doesn't happen. And this is, I think Judge O'Malley's got it right, this is a manual for dummies. Computer software or viruses for dummies. This is the least far-seeing from enablement. And the fact that we put in argument and expert declaration saying that the complete absence of teachings there I believe is sufficient to overcome the presumption. Mr. Kelly points out correctly that in the enablement section, you never cite to your expert declaration. How do you respond to that? We put the expert declaration under 37 CFR 1.132 with the site saying that it is evidence submitted to a traverse rejection not otherwise of record. So we actually put in the expert declaration for that very reason, not to repeat it in the brief itself. Thank you. Thank you, Your Honor. The case is submitted. I thank both counsel for their arguments.